ELBY KESTER, RESPONDENT, v. METROPOLITAN LIFE INSURANCE CO., APPELLANT.—71 S. W. (2d) 839.

Kansas City Court of Appeals. April 30, 1934.

*Baker & Long* and *Silvers & Hargus* for respondent.

*Meservey, Michaels, Blackmar, Newkirk & Eager, Leroy A. Lincoln, Roy P. Swanson, Albert L. Reeves, Jr.,* and *L. M. Crouch* for appellant.

CAMPBELL, C.—The defendant in the latter part of June, 1932, the exact day was not shown, issued to Eva Kester in Kansas City, Missouri, a policy of life insurance by the terms of which it promised upon her death to pay to plaintiff, her husband, the sum of $2000. The application for the policy was made May 4, 1932, and an amended application which confirmed the answers in the original application was signed June 6. The insured died July 23, 1932. Plaintiff thereupon furnished proofs of death, defendant denied liability, and this suit followed. Trial resulted in a judgment for plaintiff in the sum of $2126.40 of which $250 was attorneys' fee. Defendant has appealed.

The pleaded defense was that the insured knowingly and intentionally made false statements in the application of May 4, which statements were confirmed in the amended application of June 6; that for several months prior to May 4 the applicant had suffered pain in the lower region of her abdomen, and that her usual medical attendant, Dr. Wilkerson and others, had treated her for appendicitis, bronchitis, sinusitus, disease of the liver, jaundice and other ailments; that on May 5 she entered a hospital in Kansas City and on May 6 underwent an operation for chronic appendicitis; that at the time the policy was applied for she was suffered from biliary obstruction, jaundice, cholelithiasis and inflammation of the gall bladder, which diseases caused her death; that it was the duty of the applicant to advise defendant of her condition before accepting the policy; that

she totally failed to perform such duty and that such failure constituted a fraud upon defendant and rendered the policy void.

At the close of plaintiff's evidence and again at the close of all the evidence, the defendant requested the court to direct verdict in its favor. The requests were denied. If the court correctly ruled the latter request, the former needs no attention.

In view of the verdict we must, in determining the question, accept as true the evidence favorable to plaintiff and reject as untrue the defendant's evidence unless it tends to support plaintiff's case. [Huselton v. Commerce Trust Co., 64 S. W. (2d) 757.]

Although the defense was an affirmative one, the plaintiff at the threshold of the trial introduced the policy, copy of the original application and copy of the amended application. In the original application the insured said that she was "last sick" in 1920, at which time her frontal sinus was drained; that she had not had appendicitis, disease of the liver or jaundice; that she was in good health and had not been treated by a physician during the last five years. These statements were confirmed in the amended application.

The plaintiff introduced the deposition of Dr. Wilkerson. The deponent testified that on April 21, 1932, plaintiff's wife consulted him; that she was complaining of pain in the lower right abdomen "which began in a short, sharp attack four or five years ago, has been repeated several times;" that on May 2 or 3, 1932, she had an accute attack of appendicitis; that he advised an operation and that the operation was performed May 6.

Plaintiff testified that in March, 1931, his wife was surgically treated in the Bethany Hospital, her right radial antrum was removed and "her sinuses were drained;" that she remained in the hospital about twelve days; that on May 5, 1932, she was taken to a hospital and on the following day her appendix was removed; that she remained in the hospital ten days, returned to her home, and two or three days later went to work in her beauty parlor.

It is apparent that the applicant made incorrect answers in the application for the policy and repeated them in the amended application. There was substantial evidence, however, that neither the sinus trouble nor appendicitis caused or contributed to the death of the insured.

Section 5732, Revised Statutes 1929, provides that no misrepresentation made in obtaining a policy of life insurance shall render the policy void unless the matter misrepresented "shall have actually contributed to the contingency or event on which the policy is to become due and payable. . . ." There was evidence that the sinus trouble and the appendectomy contributed to the death of the insured. The conflict however, was for the jury.

But the case does not end here. We will not detail the evidence showing the cause of death. Suffice it to say that the evidence of

both plaintiff and defendant shows that cholelithiasis and biliary obstruction caused the death of the insured; that jaundice, a condition characterized by yellowness of the eyes and skin, is caused by cholelithiasis and biliary obstruction.

Dr. Wilkerson further testified that between June 7-10 plaintiff's wife was jaundiced and was "complaining of the jaundice symptoms;" that she had probably been having jaundice for several days "before that," and that at that time she had infection in her gall ducts.

In the proofs of death which the plaintiff furnished to the defendant was a copy of the hospital record of the insured. Therein under date of July 11 is the following: "About six weeks ago she became jaundiced and then suffered with a skin rash on her chest and back. Her jaundice has gradually disappeared but if she stands on her feet, she becomes nauseated and her jaundice deepens." The final diagnosis under the same date was "cholelithiasis-biliary obstruction."

Dr. Smith testified in deposition, introduced by the plaintiff, that he called at insured's home on July 10; that at that time she had "severe pain, general pain, swelling, shortness of breath, gastric disturbance and nausea, some temperature, headache, constipation . . . ;" that she entered the Bethany Hospital the next day; that in a few days thereafter she underwent an operation for the relief of the obstruction of the common duct; that the patient did not recover from the operation, and that the primary cause of death was cholelithiasis and biliary obstruction. Concerning the duration of the condition in which he found his patient, he testified:

"Q. How long would you say that condition had existed? A. Well, there is no way of establishing a definite time. I would imagine within a few weeks; I couldn't say longer than that.

"Q. Possibly six weeks? A. Yes.

"Q. Might it have been eight? A. Well, I couldn't say.

"Q: Possibly; might have been eight, would you say? A. Well, that would be impossible to determine, the length of time, but within a few weeks. Might be eight weeks, might be six weeks, but I hardly thing it would be that long because usually, for that length of time, the adhesions become more fibrous, more dense. . . . A. I don't think longer then possibly eight weeks; I couldn't imagine that. Of course, it may have been longer but different with different individuals, due to the extent or amount of inflammation and the severity of the case, would have quite a part to play."

Plainly, the evidence of both Dr. Wilkerson and Dr. Smith and the hospital record shows that plaintiff's wife, prior to the delivery of the policy, was jaundiced, complained of the condition, and that the jaundice was produced by the very disease which later caused her death.

The questions presented are: First, were the representations made

by the applicant in her application continuous statements and in effect at the time the policy was delivered? The application was a proposal to buy a policy of life insurance; a contract which would not be effective until delivered. To induce the defendant to accept the proposal, the applicant represented that she was in good health, had not had disease of the liver or jaundice. The representations perished on the day they were made or they continued in effect until acted upon by the corporation to which they were made. Both reason and authority say that the representations were continuous statements and must be regarded in law as though they were made at the time the policy was delivered. [Stipcich v. Metropolitan Life Ins. Co., 277 U. S. 311; McKenzie v. Northwestern Mutual, 26 Ga. App. 225, 105 S. E. 720; Harris v. Security Mutual, 130 Tenn. 325, 170 S. W. 474.]

Second, was there substantial evidence contradicting the evidence of Dr. Wilkerson, the evidence of Dr. Smith and the hospital record? If so, the case was for the jury.

The defendant's medical examiner examined the applicant on May 5 and found that she was in good health, a "first class" risk. The plaintiff argues that the certificate of the medical examiner was sufficient to rebut admissions in the proofs of death, and cites the case of Ryan v. Metropolitan Life Ins. Co., 30 S. W. (2d) 190.

The doctrine of the Ryan case is not applicable to the facts in this case. In this case the plaintiff, on the day of the medical examination, entered the Bethany Hospital for the purpose of having her appendix removed; a fact admitted by plaintiff. And if she were in good health at the hour of the medical examination, she did not remain so throughout that day. Nor does the certificate of the medical examiner tend to contradict the evidence of Dr. Wilkerson to the effect that the applicant was jaundiced and complained of the condition between June 7-10.

The plaintiff testified that his wife, between the date of the sinus operation and May 4, worked in her place of business every day, performed all of her household duties and appeared to be in good health. That evidence contradicted the evidence of Dr. Wilkerson as to the duration of appendicitis but does not tend to show that plaintiff's wife did not complain of the jaundice symptoms between June 7-10.

The only evidence in the record which it can be claimed tends to show that plaintiff's wife was not jaundiced before the policy was delivered was the personal testimony of plaintiff, as follows:

"Q. At the time she went to work after the appendix operation describe to the jury the physical condition of your wife as you saw and observed it? . . . A. She went back to work in about two or three days and done her work until the next attack and worked in the shop and done the housework at home.

"Q. You saw her doing work about the house, did you? A. Yes, sir, I was home every night. . . .

"Q. What was the next time your wife was operated on, do you recall the date? A. About the 11th of July.

"Q. She went to the hospital again on the 11th of July, 1932? A. Yes, sir.

"Q. And was operated on on the 19th day of July, 1932? A. Yes, sir.

"Q. Prior to her return to the hospital on July 11th, how long had she been off work? A. Well, I think she came home on about the 7th or 8th of July.

"Q. Between the approximate dates of May 20th, and the 7th or 8th of July, she worked at the shop? A. Yes, sir, every day.

"Q. And also performed her household duties? A. Yes, sir
. . .

"Q. When did you first notice any change in her condition as to her not being a well woman after she went back to work? A. You mean when she took sick?

"Q. Yes, sir. A. Along about the 7th or 8th when she came home. . . . .

"Q. Describe to the jury what her condition was as you observed it between the 7th or 8th of July and July 11, 1932 . . . . A. You mean when she came home?

"Q. From July 7th to July 11th? A. Her condition? .

"Q. Yes, sir. A. Well, she turned yellow and her legs swelled.

"Q. Approximately what date was it when you observed this change? A. Well, somewhere around the 4th or 5th.

"Q. That was when it first started to develop? A. Yes, sir.
. . . .

"Q. When did you first notice this jaundice condition appearing on your wife and the swelling of her legs? A. Around the first of July to the fourth.

"Q. The first of July? A. Yes, sir, around that."

Further in his evidence plaintiff said that his wife was treated by Dr. Coburn "about the first of July or the last of June." The evidence of plaintiff that he did not observe or notice the jaundice or swelling until July "7th or 8th" or "somewhere around the 4th or 5th" or "around" July 1, was not in conflict with the evidence to the effect that his wife was jaundiced and complained of it to her doctor in the early part of June. Especially is this true in view of the evidence of Dr. Wilkerson to the effect that though in the early part of June he was alarmed concerning the condition of plaintiff's wife notwithstanding "she didn't look very sick." There was no evidence that plaintiff's wife in the early part of June had such a distinct discoloration of her skin as would have been observed by her husband. In such circumstances the evidence of plaintiff did not

tend to disprove the recitals in the hospital record nor contradict the evidence of the expert medical witness who testified in plaintiff's behalf. [Smith v. Mo. Ins. Co., 60 S. W. (2d) 730.]

The conclusion is inescapable that plaintiff made an affirmative showing that his wife prior to the execution of the contract of insurance was afflicted with the disease which later caused her death; that jaundice, a symptom of the fatal malady; was present in the early part of June, and that she complained of that condition. We find no evidence of probative force to the contrary. Hence the case was for the court, not for the jury. The judgment is reversed. *Reynolds, C.,* concurs.

PER CURIAM:—The foregoing opinion of CAMPBELL, C., is adopted as the opinion of the court. The judgment is reversed. All concur.